## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**LION FEDERAL CREDIT UNION,**

      **Plaintiff,**

         **Case No. 1:24-cv-163**

    **v.**

         **JUDGE DOUGLAS R. COLE**

**WORLDPAY, LLC,**

      **Defendant.**

## <u>OPINION AND ORDER</u>

Plaintiff Lion Federal Credit Union (Lion) and Defendant Worldpay, LLC, are before the Court on a contract dispute over Worldpay's allegedly spotty terminal- and card-related products and services. Lion alleges that Worldpay's failure to provide reliable and timely service prevented its customers from accessing their financial information when needed, thereby rendering Worldpay liable in contract and tort as well as under an Arkansas statute. Worldpay has moved to dismiss all claims. Given the contract's plain language, the Court agrees in large part with Worldpay and accordingly **GRANTS IN PART AND DENIES IN PART** Worldpay's Motion to Dismiss First Amended Complaint (Doc. 38) under Rule 12(b)(6). Specifically, the Court **DISMISSES** Counts II, III, and IV of the Amended Complaint (Doc. 35) **WITH PREJUDICE** and **DISMISSES** Count V of the Amended Complaint (Doc. 35) **WITHOUT PREJUDICE**.

## I.    BACKGROUND[1]

Lion, a federally chartered credit union, sought to implement online financial services for clients by contracting with Worldpay. (Doc. 35 ¶¶ 1, 8, #119–20). The parties intended to have Worldpay deploy terminal, debit card, card production, and gateway services to Lion. (*Id.* ¶¶ 1, 8, #119–20). To govern this agreement, they executed a Master Services Agreement (MSA) dated January 1, 2012, as well as an amendment, which collectively established that the term of their business relationship would last for a period of seven years. (*Id.* ¶¶ 8–11, #120–21; Doc. 35-1, #134, 138–39, 144). The contract also included an automatic renewal provision that stated in plain terms that "unless either party g[ave] written notice to the other party at least 180 days prior to the expiration of any term, the [MSA] … [would] be automatically extended for additional periods equal to the Initial Term" of seven years.[2] (Doc. 35-1, #138). When renewal came due in 2018, neither party provided notice, so the MSA automatically renewed for another term. (Doc. 35 ¶ 17, #122).

---

[1] As this matter comes before the Court on a motion to dismiss, the Court must accept the well-pleaded allegations in the Amended Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations.

[2] The Court may consider the attached MSA, its amendment, Lion's notice-of-termination letter, and Worldpay's proposed modification in reply, (Docs. 35-1 to -3), at the motion-to-dismiss stage because the "document[s] [are] referred to in the pleadings and [are] integral to the claims." *Washington v. City of Cincinnati*, No. 1:23-cv-230, 2024 WL 474403, at *2, *7 n.10 (S.D. Ohio Feb. 7, 2024). The Court declines, however, to consider what appears to be a cropped email chain with only one email excerpted, (Doc. 35-4), as that document (which would be inadmissible in its current form for a lack of foundation) has none of the signifiers of the type of written instruments that may validly be considered part of the pleadings. Fed. R. Civ. P. 10(c); *CFPB v. Fifth Third Bank, N.A.*, No. 1:21-cv-262, 2023 WL 7325956, at *3–*4 (S.D. Ohio Sept. 26, 2023) (explaining that courts routinely decline at the motion-to-dismiss stage to consider documents that lack self-verifying qualities, such as containing signatures or being written on official letterhead, especially when those documents do not

Although the Complaint does not disclose whether any problems arose during the first seven-year term, it does allege that Lion has not been satisfied with Worldpay's services during the renewal period. Specifically, Lion alleges that Worldpay's services were not reliable, such that Lion's employees and customers frequently found themselves unable to access their financial accounts. (*Id.* ¶¶ 19–21, #122–23). As a result of this purportedly weekly problem, Lion alleges it has had to incur costs to create workarounds and has waived fees and reimbursed customers for charges occasioned by their loss of access to their accounts during the system downtimes. (*Id.* ¶ 22, #123). Lion highlights, as indicative of Worldpay's inadequate services, an alleged incident in November 2021 during which Worldpay's debit-card router failed, thereby preventing all business transactions for a two-week period. (*Id.* ¶¶ 24, 26, #123–24). Beyond these technical issues, Lion alleges that Worldpay has been less than responsive when contacted. For example, Lion alleges it had trouble reaching Worldpay's technical support team when its debit-card router failed. (*Id.* ¶ 24, #123). And it alleges that Worldpay's eventual response was inadequate because Worldpay sent Lion an AT&T technician who could not address the actual problem, which was with Worldpay's equipment, not AT&T's. (*Id.* ¶ 25, #124).

Frustrated with Worldpay's lack of communication and its services' lack of reliability, Lion sought to terminate the MSA on March 3, 2022, per the MSA's termination provisions. (*Id.* ¶ 27, #124). To that end, Lion sent Worldpay a letter documenting perceived deficiencies and giving Worldpay until August 8, 2022, to

_____

purport to define the parties' rights and obligations because such exhibits are better subject to evidentiary testing via discovery or a motion for summary judgment).

cure. (*Id.*; Doc. 35-2). On May 12, 2022, Worldpay responded by providing a proposed modification of the MSA to set out the parties' obligations in light of what Worldpay described as Lion's early termination. (Doc. 35 ¶ 29, #124; Doc. 35-3). This proposed modification set forth Worldpay's position that by terminating the agreement early, Lion owed $216,531.17 in liquidated damages. (Doc. 35 ¶ 29, #124; Doc. 35-3, #147). This proposed modification also stated that Worldpay would provide Lion all debit-card-related files for Lion's clients upon successful execution of the modification. (Doc. 35-3, #148). Lion never signed this document, as it has characterized Worldpay's actions to be the equivalent of holding its client's debit-card files "hostage for a ransom of 'liquidated damages.'" (Doc. 35 ¶ 34, #125). Lion further alleges Worldpay did not make progress on improving its services, and thus Lion deems the contract to have been terminated on August 8, 2022. (*Id.* ¶¶ 30–31, #125). Among other things, Lion alleges that Worldpay's failure to cure is evidenced by Worldpay's failure to issue any new cards Lion requested after May 2022. (*Id.* ¶ 33, #125).

Lion also maintains Worldpay's refusal to hand over its debit-card files has multiplied Lion's expenses. Lion alleges that, without those files, it could not convert its business to another card service provider until nearly a year after this suit's inception. (*Id.* ¶ 35 & n.3, #125–26). And Lion alleges that, as of late October 2022 (over two months after the agreement was terminated and about five months after Lion learned of Worldpay's plan to hand over the files only upon execution of the modification and payment of liquidated damages), it had paid $20,000 for a platform

4

that it could not use because the software for that platform required Lion to supply the debit-card files Worldpay had not returned.[3] (*Id.* ¶¶ 36–37, #126).

So Lion sued Worldpay in the Western District of Arkansas on January 3, 2023. (Compl., Doc. 2). After Worldpay moved to dismiss the initial Complaint, (Doc. 33), Lion filed its Amended Complaint on July 10, 2023. (Doc. 35). In it, Lion raised six claims against Worldpay for breach of contract (Count I), unjust enrichment (Count II), negligence (Count III), an alleged violation of the Arkansas Deceptive Trade Practices Act (ADTPA) (Count IV), tortious interference (Count V), and declaratory relief (Count VI). (*Id.* at #126–33).

That prompted Worldpay's July 24, 2023, Motion to Dismiss First Amended Complaint (Doc. 38), which is currently before the Court. In the renewed motion, Worldpay moved to dismiss for improper venue, as the MSA's forum selection clause required any suit to be brought in a court in southern Ohio. (Doc. 39, #159–61 (citing Doc. 35-1, #137)). In the alternative, Worldpay argued that the case should be transferred to this Court. (*Id.* at #161–62). It also challenged the sufficiency of the Amended Complaint to state any claim for relief. (*Id.* at #162–80).

Lion responded opposing all of Worldpay's arguments. As relevant here, Lion argued that the MSA's forum selection clause (and the corresponding choice-of-law

---

[3] Lion also points to Worldpay's refusal to complete Lion's order of eighteen debit cards for its members on August 15, 2022—one week after Lion treated the MSA as having been properly terminated—as further evidence of Worldpay's refusal to cure its alleged deficient performance. (Doc. 35 ¶¶ 30, 32, #125). The Court is unclear why Lion believes an order it placed after it felt the agreement was no longer in force would have been completed by Worldpay, let alone why this failure would evidence Worldpay's unreliable services. After all, Lion alleges the agreement had no more legal force at the time, which certainly implies that Worldpay would owe Lion *no* obligation to comply with such a request.

clause contained in the same provision) was unconscionable and therefore unenforceable. (Doc. 44, #192–93). And in disputing Worldpay's arguments that the Amended Complaint failed to state a claim for relief, Lion argued that most of Worldpay's arguments were inapt because *Arkansas* law applied despite the MSA's choice-of-law clause, which provides that Ohio law applies. (*Id.* at #197–200).

On March 26, 2024, the then-assigned Judge issued her Order granting Worldpay's request to transfer venue (construing the request as a motion to transfer under 28 U.S.C. § 1404(a)) from the Western District of Arkansas to this Court. (Doc. 50, #228–29, 234). In particular, the Judge concluded that the MSA's forum-selection clause required transfer, thereby rejecting Lion's arguments that the clause was neither enforceable nor mandatory. (*Id.* at #227, 231–34). As the transfer under § 1404(a) obviated the venue issue, that Judge also denied Worldpay's motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). (*Id.* at #234). But she declined to rule on Worldpay's arguments that the Amended Complaint must be dismissed for failure to state a claim under Rule 12(b)(6)—leaving that question open. (*Id.*). Following the transfer to this District, the undersigned held a telephone status conference with the parties on April 4, 2024. At that conference both parties informed the Court of their view that the Rule 12(b)(6) motion to dismiss remains pending and is ready for a ruling. (4/4/24 Min. Entry). So the matter is ripe for the Court's review.

## II.     CHOICE OF LAW

Before delving into the motion to dismiss and the parties' arguments, the Court must address a preliminary issue: what law applies? As a reminder, Lion maintains that Arkansas law applies, while Worldpay's briefing relies on the MSA's choice-of-law provision to argue that Ohio law applies. (*Compare* Doc. 39, #165 (citing Doc. 35-1, #137), *with* Doc. 44, #197–200). To resolve this dispute, the Court must look to the applicable conflict-of-law rules. Because this case was transferred pursuant to 28 U.S.C. § 1404(a), the Court must apply the law that would govern the suit were it to have continued in the transferor district court. *Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964). Accordingly, as this suit was transferred from the Western District of Arkansas, where it was pending under that court's diversity jurisdiction, this Court must employ Arkansas's conflict-of-law rules in assessing what law applies to each claim raised in the Amended Complaint. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

## A.     Applicable Law for Contract Claims (Counts I, II, VI)

Start with those counts of the Amended Complaint that state quintessential examples of claims arising directly under the MSA: the claims for breach of contract (Count I), unjust enrichment (Count II), and declaratory judgment (Count VI).

The applicable law governing the MSA has, in some sense, already been decided by the choice-of-law provision. Lion had challenged the MSA provision containing both the forum-selection and choice-of-law provisos as unconscionable and unenforceable. (Doc. 44, #192–93). But the Arkansas Judge's enforcement of the

forum-selection clause to transfer this case to the undersigned necessarily resolved the issue against Lion. (Doc. 50, #227, 231–34). Namely, over Lion's objections, that Order determined that the MSA's choice of forum was valid, enforceable, and binding on the Court. This ruling on the applicability of the MSA's forum-selection clause— and, by implication, the connected choice-of-law proviso, (Doc. 44, #192–93 (Lion's arguing that the enforceability of both the forum-selection and choice-of-law provisions rises and falls with the unconscionability of the automatic renewal provision))—constitutes the law of the case and binds this Court, especially given no party requested supplemental briefing on whether the matter should be reconsidered.[4] *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 590 (6th Cir. 1995) ("The pre-transfer rulings constitute the law of the case and should not be lightly disturbed." (cleaned up)).

---

[4] Even were the Order not binding, this Court would reach the same conclusion. The only argument Lion proffers for why the MSA is unenforceable is its belief that the automatic renewal provision renders the entire contract unconscionable. (Doc. 44, #192–93). But the Court sees neither procedural nor substantive unconscionability here. Lion's conclusory assertion that procedural unconscionability exists because of discrepancies in bargaining power does not constitute a well-pleaded allegation of that fact, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)—especially considering both Lion and Worldpay are sophisticated business entities, (Doc. 35 ¶¶ 1, 3, #119). Moreover, contrary to Lion's allegation that the MSA was a pure adhesion contract, Lion itself acknowledges that the terms of the form MSA were modified by agreement of both parties via an amendment, which thereby reveals that this 'form' contract's terms could be negotiated. (*Compare id.* ¶ 12, #121, *with id.* ¶ 10–11, #121). Additionally, not only does Lion's briefing make no effort to explain the substantive unconscionability of the renewal provision, (Doc. 44, #193 (arguing only procedural unconscionability)), but also there is nothing unusual about a contract between sophisticated businesses that rolls over for another term unless a party provides notice of its desire to terminate the agreement. Such provisions are common in commercial contracts and are, unsurprisingly, enforced as a result. *See, e.g.*, *Valmac Indus., Inc. v. Chauffeurs, Teamsters, & Helpers Loc. Union No. 878*, 547 SW. 2d 80, 81 (Ark. 1977) (holding that an unambiguous renewal provision much like the one at bar was enforceable when neither party provided notice of termination as required). So Lion's unconscionability argument lacks merit, and the MSA's choice-of-law, forum selection, and renewal provisions are therefore enforceable.

But that the MSA's choice-of-law provision is enforceable as a matter of contract law does not resolve the entire issue. The Court next must ask whether Arkansas's conflict-of-laws rules require the Court to discard the parties' (contractually valid) choice of governing law here. In Arkansas, a choice-of-law provision will be enforced so long as there is a substantial connection between the contract and the chosen law. *Cooper v. Cherokee Vill. Dev. Co.*, 364 S.W.2d 158, 161–62 (Ark. 1963). Despite Lion's fixation on its citizenship as a reason to think only Arkansas has a connection to the MSA, (Doc. 44, #198–99), there is a clear Ohio connection to this dispute: Worldpay's principal place of business, which unsurprisingly is the central nervous system from which its services are shared and provided to customers like Lion, is in Ohio, (Doc. 35 ¶ 3, #119; Doc. 35-1, #137 (listing Worldpay's Ohio address as the primary location Lion should contact for any notices or issues under the MSA)). As an Arkansas court explained in an analogous context, "[i]t is quite natural for a New York lender to loan its money in New York, to require it to be repaid in New York and to stipulate that the contract be governed by familiar New York law." *Cooper*, 364 S.W.2d at 163. Just the same here. It is reasonable for an Ohio card services business that operates in Ohio to provide its services to an out-of-state client from Ohio, to seek to have all notices sent to an Ohio address, and to have the related contract governed by Ohio law. Ohio law clearly has force under the parties' stipulation to that effect in the contract.

Neither of Lion's case citations requires otherwise. Lion first cites *Britelink, Inc. v. TeleCorp PCS, Inc.*, No. 3:03-cv-207, 2004 WL 5509416, at *5 (E.D. Ark. May

9

6, 2004). (Doc. 44, #198–99). In *Britelink*, the district court applying Arkansas's conflict-of-laws principles explained that the fact that defendant's principal place of business (where it performed its contractual obligations during the lifetime of the contract) was in Virginia and that its notice of termination of the contract was sent from Virginia were "sufficient to warrant application of [Virginia] law [as] chosen by the parties." *Id.* at *5. The reason the *Britelink* court ultimately declined to apply that choice of governing law was because it found that the plaintiffs' statutory claim under the Arkansas Franchise Practices Act (i.e., a claim independent of the contract at issue) could not be displaced by a choice-of-law provision, which governed only those claims *arising under* the contract itself. *Id.* at *3, *5–*8. In other words, that some of the contractual performance in *Britelink* occurred in Arkansas created a sufficient nexus between the parties' business relationship and Arkansas for the plaintiffs to state a valid statutory cause of action under Arkansas law. *Id.* So *Britelink* does not mean Ohio law does not apply to Lion's common law contract claims as Lion posits.[5] Rather, it supports application of the parties' choice of governing law.

Next Lion cites *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 930 (8th Cir. 1999), for the proposition that the choice-of-law provision violates Arkansas public policy because the MSA "does not provide 'fair warning'" that Ohio, rather than Arkansas law, would govern the parties' relationship. (Doc. 44, #199). But *Jones* is

---

[5] That said, the distinction in *Britelink* between a claim arising under the contract and arising under a statutory enactment does require consideration of the legal sufficiency of Lion's ADTPA claim notwithstanding the parties' choice of Ohio law. Lion's Arkansas operations create a sufficient nexus to Arkansas for its statutory law to apply here. (Doc. 35 ¶¶ 1–2, 8, #119–20).

10

not helpful here. That court held only that a narrowly worded choice-of-law provision stating that Texas law applied solely to the proper "interpretation" of the contract at issue did not provide fair warning that the agreement barred the application of all Arkansas law, including its positive statutory enactments. 180 F.3d at 930. In contrast, the applicable language here is both clear and all-encompassing. It plainly states that the MSA "shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio"—suggesting the proviso means what it says: Ohio law governs. (Doc. 35-1, #137).

Not only does the clarity of the provision undercut Lion's position, but the Court is further skeptical of Lion's assertion that it lacked fair notice of the choice-of-law provision and its scope. The parties' stated choice of law is physically located in the MSA only a couple of paragraphs above the signature block. (*See id.* at #137). And it is well established that sophisticated parties are presumed to know the scope of their obligations when they sign a contract. *See Gen. Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1099 (6th Cir. 1994). So, given the provision's plain language and Lion's sophistication, the Court finds no merit in Lion's suggestion that it lacked fair warning—the MSA provided nothing but fair warning that the parties intended Ohio law to govern any contract dispute.

Simply, a straightforward application of Arkansas's choice-of-law principles here warrants the application of Ohio law to Lion's contract claims under the MSA, save for its statutory ADTPA claim.

**B.    Applicable Law for the Tort Claims (Count III, V)**

Turn next to the two claims Lion styles as purported tort claims: one for negligence and one for tortious interference. At first blush, claims labeled "negligence" and "intentional interference" certainly sound like torts. Yet "the initial step in any choice of law analysis involves the characterization of the subject matter of or the issues in the case (e.g., tort or contract) and of the nature of each issue and whether it raises a problem of procedural or substantive law." *Dawson v. Allstate Vehicle & Prop. Ins. Co.*, No. 1:22-cv-776, 2024 WL 22735, at *3 (S.D. Ohio Jan. 2, 2024) (cleaned up). And the Court applies the applicable conflict-of-law rules to this 'initial characterization step'—here, Arkansas's rules. *Id.* In Arkansas, "the basic distinction [between tort and contract] is that the purpose of the law of contract is to see that promises are performed, while the law of torts provides redress for various injuries." *CEI Eng'g Assocs., Inc. v. Elder Const. Co.*, 306 S.W.3d 447, 452 (Ark. Ct. App. 2009). Hence, "a breach of contract is not treated as a tort if it consists merely of a failure to act (nonfeasance), as distinguished from an affirmatively wrongful act (misfeasance)," where misfeasance constitutes misconduct that creates a "foreseeable, unreasonable risk of harm to the plaintiff's interests." *L.L. Cole & Son, Inc. v. Hickman*, 665 S.W.2d 278, 281 (Ark. 1984) (approving of a court's independent assessment of "the real character of the action").

Despite Lion's attempt to style Counts III and V of the Amended Complaint as tort claims, the allegations plainly and clearly sound in contract.

Start with the nominally labeled 'negligence' claim. Lion alleges Worldpay failed to perform its duty "to provide adequate and reliable services." (Doc. 35 ¶ 56,

12

#128). But Worldpay owed Lion that duty only by virtue of the contract the parties executed—the MSA. *See CEI Eng'g Assocs.*, 306 S.W.3d at 453 ("The claims of inadequate staffing and the use of unqualified personnel represent nothing more than Elder's dissatisfaction with how CEI set about to fulfill its obligations under the agreement and with the untimeliness of CEI's performance."). Similarly, Worldpay is alleged to owe a duty to make accurate and timely electronic fund transfers under the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.* (Doc. 35 ¶ 57, #129); *but see infra* Section III.C & n.6. But the only reason Lion had "reasonable expectations," (Doc. 35 ¶ 61, #129), that Worldpay would execute any requested financial transfers in conformity with EFTA is because of the *contractual* promises set forth in the MSA. Namely, Worldpay would not have any purported EFTA obligations but for its promise to Lion that it would assume financial transfer obligations as part of its provision of terminal- and card- services. In addition, Lion's expectation that Worldpay would "observe reasonable commercial standards" in its commercial interactions with Lion, (*id.* ¶ 58, #129), is another way to say that Lion expects Worldpay to adhere to a "duty of good faith and fair dealing," *Good Faith*, Black's Law Dictionary (11th ed. 2019) (defining "good faith" in contract law as "observance of *reasonable commercial standards of fair dealing* in a given trade or business" (emphasis added)). In Arkansas, a party's alleged violation of that implied duty is "nothing more than evidence of a possible breach of a contract between parties." *Ark. Res. Med. Testing, LLC v. Osborne*, No. 10-750, 2011 WL 1423993, at *2–*3 (Ark. Apr. 14, 2011) (explaining that Arkansas law does not recognize a

13

standalone claim for breach of the duty of good faith and fair dealing in either tort or contract).

Because "[c]ontract law deals with enforcing an exchange of promises," *Shanghai Weston Trading Co. v. Tedia Co.*, No. 1:23-cv-117, 2023 WL 8787235, at *1 (S.D. Ohio Dec. 19, 2023), and given that Lion's alleged unfulfilled expectations detailed in the so-called 'negligence claim' exist only on account of the exchange of promises memorialized in the MSA, Arkansas law requires treating Lion's claim for Worldpay's allegedly 'negligent' nonperformance of its contractual duties in Count III of the Amended Complaint as nothing other than a hornbook contract claim. As explained above, *see supra* Section II.A, the parties' choice of Ohio law in the MSA therefore means Ohio law governs the (disguised) contract claim found in Count III of the Amended Complaint.

That leaves Lion's 'tortious interference' claim. It poses a closer question as Lion's formulaic recitation of the elements of the cause of action and conclusory assertions evoke images of Worldpay's intentionally acting to interfere with and to disrupt Lion's contractual relationships with its members. (*See* Doc. 35 ¶¶ 77–83, #132). But there are a couple of problems with resting on this first impression. For starters, the Supreme Court of Arkansas has noted a distinction between a party's "tortious interference … with [a] contract negotiated between" his counterparty and a third party (a tort) and "tortious misfeasance [merely] incidental to the breach of contract" itself (a claim under a contract). *Hickman*, 665 S.W.2d at 281. For this reason, it later clarified that "a plaintiff may not transform a breach of contract action

14

into a tort claim [merely] by alleging the breach was motivated by malice" or bad faith. *Quinn Cos. v. Herring-Marathon Grp., Inc.*, 773 S.W.2d 94, 94 (Ark. 1989). In addition, the Supreme Court of Arkansas has established a baseline rule that unless "the plaintiff [] specifically plead[s] … his cause of action in tort[,] … the presumption will be that the action[,] [which involves allegations that could be characterized as arising in either tort or contract, is deemed to sound] in contract [such that] punitive damages are not recoverable." *Hickman*, 665 S.W.2d at 281.

So the question is, what has Lion substantively pleaded in its nominal 'intentional interference' claim? All roads again point to contract law. Why does Lion believe Worldpay interfered with its relationships with its members? The answer: "Worldpay's noncompliance and nonperformance under the MSA" and its failure to comply with Lion's alleged termination of the agreement by refusing to turn over Lion's debit card files despite its "knowledge of the contractual relationship and business expectancy *as reflected by the terms of the MSA*." (Doc. 35 ¶¶ 78, 81, #132). That Lion adds conclusory allegations that Worldpay's breach of the MSA was "intentional and improper" and "in bad faith" is immaterial under Arkansas (or federal pleading) law. When Lion's expectations about the duties Worldpay owed are defined in the parties' contract and the downstream harms to third parties stem from Worldpay's alleged nonperformance of those contractual obligations, "the presumption … that the action is in contract" under Arkansas applies with full force. *Hickman*, 665 S.W.2d at 281.

15

As with Lion's nominal negligence claim, Lion simply attempts to restate its contract claim by clothing it with the language of tort—here, by adding allegations about a mental state to attempt to convert the contract claim into an intentional tort. Not only is that improper under Arkansas law, *Quinn*, 773 S.W.2d at 94, but the essence of this claim is revealed by Lion's own allegations. It claims to have suffered direct and downstream harms from Worldpay's broken *promises* under the MSA. Such substantive allegations plainly invoke contract law principles as the basis for recovery. *See Revel Sys., Inc. v. Frisch's Rests., Inc.*, No. 1:23-cv-507, 2024 WL 1406107, at *4 (S.D. Ohio Apr. 2, 2024) ("The very definition of a contract is a promise or set of promises for the breach of which the law gives a remedy." (cleaned up)). Accordingly, the disguised contract claim in Count V of the Amended Complaint is also governed by Ohio law, as per the parties' choice of governing law set forth in the MSA. *See supra* Section II.A.

*      *      *

Altogether, the Court concludes that under the applicable, Arkansas conflict-of-law rules, Ohio law applies to all counts in the Amended Complaint save for Lion's ADTPA claim, which is governed by the terms of that Arkansas statute.

### III.    LAW AND ANALYSIS

With the governing law established, the Court turns to whether the Amended Complaint states a claim for relief. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*,

16

854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up).

## A. Count I – Breach of Contract

Under Ohio law, "to establish a breach of contract, the plaintiff must establish … that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Quest Workforce Sol'ns, LLC v. Job1USA, Inc.*, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016) (cleaned up). The Amended Complaint adequately pleads all those requirements (albeit without much detail). Lion alleges that (1) the MSA constitutes a valid agreement between the parties; (2) Lion properly performed all of its obligations under the agreement and timely provided notice as required by the termination provisions; (3) Worldpay promised to deliver services that would enable Lion and its members to access their financial accounts but the services rendered were not up to snuff; and (4) due to disruptions in service, Lion suffered losses because it could not run its credit union as its customers expected. (Doc. 35 ¶¶ 8, 17, 19–28, 33, 39, 41–45, #120, 122–27). In other words, Lion anticipated receiving card services that would operate reliably under the MSA, did not experience such reliable

service during the renewal period, sought to terminate per the MSA's terms, and suffered harm. That plainly states a claim for relief for breach of contract.

Worldpay disagrees on two fronts by arguing that (1) Lion fails to state a claim for relief because it did not identify the specific MSA provisions violated and (2) Lion failed to satisfy the MSA's termination provisions because Lion's March 3, 2022, letter to Worldpay purporting to highlight violations of the contract and to give Worldpay a chance to cure was insufficient under the contract. (Doc. 39, #165–67).

As to the first point, Worldpay is correct that a party alleging a breach of a contract must identify what promise was broken to maintain a claim for relief. *Foster v. Health Recovery Servs., Inc.* 493 F. Supp. 3d 622, 640 (S.D. Ohio 2020) (dismissing a complaint in which no contract was attached and the plaintiff had not otherwise identified the relevant provision that purportedly was breached). Were the rule otherwise, a party would simply engage in notice pleading without offering the defendant a fair basis for understanding the nature of claim and the factual grounding plausibly supporting the plaintiff's entitlement to relief. *Twombly*, 550 U.S. at 555–56. But here, the provision at issue (though not identified by name in the Amended Complaint) is clear: the standards Worldpay was to follow when providing its card-related services to Lion. (Doc. 35 ¶¶ 27, 42, 45, #124, 127; Doc. 35-1, #138 (describing the services Worldpay promised to provide)). Put differently, Lion bought a product from Worldpay with an expectation (under the contract) that such product would work reliably and consistently during the lifetime of the contract, and the product ultimately did not meet that standard. Such allegations smack of a valid

18

claim for a breach of contract. Whether Lion will be able to prove exactly what those standards were and whether the product Worldpay provided did or did not meet the mark is another matter. But for pleading purposes, the Court finds that the Amended Complaint plausibly states a claim for a breach of the MSA. It describes in a straightforward manner Lion's (plausible) claim for why it did not receive the benefit of the bargain when the allegedly deficient card services malfunctioned and disrupted Lion's operations. *See generally Rasnick v. Tubbs*, 710 N.E.2d 750, 753–54 (Ohio Ct. App. 1998) (explaining that the proper measure of damages to be awarded for harm arising from the breach of a contract is what relief would enable the party to receive the benefit of the bargain).

What about Worldpay's second point that Lion has not adequately alleged it validly complied with the termination provisions and therefore has not fully performed its obligations under the MSA? Again, Ohio law does require Lion to comply with all express conditions precedent, such as the MSA's provision requiring Lion to give Worldpay notice of and an opportunity to cure any alleged breaches, (Doc. 35-1, #135). *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985). But that is exactly what Lion alleges it has done: Lion attaches a notice-of-termination letter it sent to Worldpay identifying the problems that Lion had with Worldpay's services (with both dates and specifics) and providing Worldpay more than 30 days to cure the alleged deficiencies. (Doc. 35-2). And Lion alleges the reliability problems continued even after it sent the termination letter. (Doc. 35 ¶¶ 30–31, #125).

19

While the Amended Complaint does not provide substantial details, the allegations raised plausibly support Lion's position that it notified Worldpay as the MSA required and that Worldpay failed to cure within the timeline provided. Worldpay's briefing really is arguing that Lion's narrative is not the whole story and that the March 2022 letter was not the type of notice the parties anticipated when they drafted the MSA's termination provisions. (Doc. 39, #167). But *those* arguments require evidentiary development and potential resolution by the ultimate trier of fact. It would be premature to resolve such factual disputes at this stage. *See Garrett v. Ohio State Univ.*, 60 F.4th 359, 367 (6th Cir. 2023). Simply, Lion has plausibly alleged that it provided the required notice and that Worldpay still fell down on the job. That suffices to ensure this claim survives the pleading stage.

So Worldpay's motion to dismiss is denied to the extent that it argues the Court should dismiss Count I of the Amended Complaint.

**B.    Count II – Unjust Enrichment**

Next, what of the unjust enrichment claim? Under Ohio law, "unjust enrichment provides that a party may recover the reasonable value of services rendered *in the absence of an express contract* if denying such recovery would unjustly enrich the opposing party." *Deffren v. Johnson*, 169 N.E.3d 270, 275 (Ohio Ct. App. 2021) (cleaned up) (emphasis added). Lion's claim must therefore fail out of the gate— it acknowledges (having attached the contract to the Amended Complaint) that all the duties Worldpay allegedly breached are structured by the MSA itself. (*See* Doc. 35 ¶¶ 8–17, 21, 28, 30, 33, #120–25; Doc. 35-1). And while Lion argues that it can

20

bring claims in the alternative, that argument cannot overcome the allegations Lion itself has provided in the Amended Complaint—that its expectation that Worldpay would provide adequate and reliable services was dictated *by the parties' execution of the MSA*. (Doc. 35 ¶¶ 8, 21, 30, #120, 123, 125). Lion even admits that the benefit it allegedly conferred was a monthly payment that accords with the timing of when the MSA was executed as well as the attached fee schedule. (*Compare id.* ¶¶ 48, 51, #127–28 *with* Doc. 35-1, #140). The only support for Lion's claim that it is entitled to relief for unjust enrichment is its formulaic recitation of the elements of an unjust enrichment cause of action, which cannot by itself state a claim for relief. *Iqbal*, 556 U.S. at 678. In other words, Lion has plainly raised a claim for breach of contract (an enforceable contract, *see supra* note 4), and only for breach of contract. *See Morgeson v. Freeman*, No. 1:23-cv-269, 2024 WL 1406105, at *4–*5 (S.D. Ohio Apr. 2, 2024) (holding that a plaintiff who had sued for harms caused by his business partner could not maintain an alternative claim under the Fair Labor Standards Act because all non-conclusory allegations supported only one inference—that he was a partner). As all the duties with which Lion expected Worldpay to comply arise under the MSA, Lion's attempt to seek unjust enrichment lacks merit. Count II must be dismissed.

## C.    Count III – Negligence

Next is Lion's claim for negligence. The Court largely answered this question above by noting that, even under Arkansas law, the claim alleged is actually one for breach of contract, not one for tort. *See supra* Section II.B. In short, because the alleged duties stem from the terms of the MSA and because the harm Lion claims it

suffered consist of economic losses occasioned by Worldpay's alleged breach of those terms, Lion's 'negligence' claim is really just an improperly recast, non-viable breach-of-contract claim. *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 705 (Ohio 2005) ("When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract. … [A plaintiff who has a claim in contract] may not, however, recover in tort when [the defendant] has no duty in tort to protect [the plaintiff] from purely economic damages.").

Lion tries to sidestep this conclusion by suggesting that Worldpay's duties existed independent of the contract under the EFTA and the prevailing "reasonable commercial standards." But that does not work for two reasons.

First, Lion cannot rely on the EFTA to ground its purported negligence claim because a claim under that Act is owned by the injured consumer, not a separate business entity involved in the transaction, like Lion. *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 401–02 (W.D.N.Y. 2010).[6] Lion provides no explanation in its papers of why it has the authority to assert the third-party rights of consumers under

---

[6] There also is a strong argument that Worldpay has no obligations even to consumers under the EFTA given it is not even clear to the Court that Worldpay is properly classified as a "financial institution" that "indirectly[] holds an account belonging to a consumer." 15 U.S.C. § 1693a(9). Under existing caselaw, a business's possession of personally identifiable information used in connection with financial transactions, (*see* Doc. 35 ¶¶ 15–16, #122), does not necessarily mean it indirectly holds customers' financial accounts as a financial institution would. *Tristan v. Bank of Am.*, No. SA cv 22-01183, 2023 WL 4417271, at *11–*12 (C.D. Cal. June 28, 2023) (concluding that the company owning the Zelle money transfer platform was not a "financial institution," under the EFTA, because it did not indirectly hold financial accounts, even though a customer's provision of a phone number or email address enrolls in Zelle's platform, which facilitates peer-to-peer payment services); *Zepeda v. PayPal, Inc.*, No. C 10-2500, 2017 WL 1113293, at *11 & n.13 (N.D. Cal. Mar. 24, 2017) ("But those obligations only apply to a 'financial institution,' which PayPal arguably is not.").

22

the EFTA.[7] Accordingly, the Court declines to permit Lion to use third parties' EFTA rights to state a negligence action against Worldpay, especially because doing so would likely run afoul of the constitutional standing caselaw. *See generally Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (holding that for a third-party standing claim to have viability there must be a "close relationship" between the plaintiff and the third party *and* a "hindrance" barring the third party from raising his own rights).

Second, as explained above, *see supra* Section II.B, the "reasonable commercial standards" to which Lion refers are actually just the implied duty of good faith and fair dealing Worldpay owes Lion *under the MSA*. *Good Faith*, Black's Law Dictionary, *supra*; *accord State ex rel. Ohio Hist. Connection v. Moundbuilders Country Club Co.*, 220 N.E.3d 678, 685 (Ohio 2022). But that duty is merely a contractual obligation whose breach cannot support an independent cause of action. *State ex rel. Maher v. City of Akron*, 2018-Ohio-4310, ¶ 19 (9th Dist.) ("Allegations of a breach of duty of good faith and fair dealing are subsumed into a breach of contract claim."). So, contrary to Lion's assertion, its negligence claim cannot be supported by reference to

---

[7] The Court suspects that what Lion is really attempting to do with its allegations about EFTA is to hold Worldpay accountable as an indemnitor for any claim Lion's members have against it for EFTA violations. (*See* Doc. 35 ¶¶ 57, 59–60, #129). But there are two problems with such a claim for indemnity (assuming this is in fact the substance of Lion's allegations). First, Lion has failed to allege it is subject to any such EFTA suit by its members, thereby rendering any harm purely speculative. Second, the MSA appears expressly to bar such recovery as Lion's recovering in indemnity would be the equivalent of permitting it to recover consequential damages contra the MSA's express limitation on such liability. (Doc. 35-1, #136 (Worldpay "shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by [Worldpay]) suffered by [Lion].")).

Worldpay's obligations to conform to reasonable commercial standards as that duty arises under contract, not tort.

In sum, Lion's negligence claim (which is really just a disguised contract claim) fails as a matter of law because no duty independent of the MSA supports it. So the Court will dismiss Count III of the Amended Complaint.

## D.    Count IV – Arkansas Deceptive Trade Practices Act

Up next is Lion's ADTPA claim, which requires Lion to have pleaded "(1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Skalla v. Canepari*, 430 S.W.3d 72, 82 (2013). But under the Federal Rules of Civil Procedure, a plaintiff cannot properly plead an ADTPA claim unless he complies with Rule 9(b)'s heightened pleading requirements, given the claim sounds in fraud. *Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*, No. 4:20-cv-1515, 2022 WL 16635130, at *4 (E.D. Ark. Nov. 2, 2022). And Lion does not come close to meeting that standard. To satisfy Rule 9(b) in this context, Lion must identify "the who, what, when, where, and how" of Worldpay's allegedly deceptive actions. *Barnett v. Kroger Co.*, No. 1:22-cv-544, 2023 WL 5899836, at *4 (S.D. Ohio Sept. 11, 2023) (citing *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255–56 (6th Cir. 2012)). But instead, Lion's Amended Complaint consistently alleges, at a 30,000-foot level, that Worldpay made deceptive or untruthful representations that caused Lion to agree to the MSA. (*See* Doc. 35 ¶¶ 66–69, 72–74, #130–31). Suffice to say that the Court has a lot of unanswered questions. For starters, what was the content of those representations, when were they made,

24

and to whom? As Lion makes no effort to explain how the Amended Complaint answers these questions and the others required by Rule 9(b)—Lion merely states generally that the pleading "contains lengthy, particularized factual allegations," (Doc. 44, #207)—it is clear Lion has failed to state a claim for relief under ADTPA.

Accordingly, the Court will also dismiss Count IV of the Amended Complaint.

## E. Count V – Tortious Interference

That brings us next to Lion's claim that Worldpay intentionally interfered with Lion's business relationships with its customers. As with Lion's negligence claim, part of the problem with the allegations in the Amended Complaint lies with Lion's attempt to recast its breach-of-contract claim as a tort claim without a valid basis for doing so. *See supra* Section II.B. And Ohio law bars such claims given "[t]he addition of the adverbs intentionally, willfully, and fraudulently will not change a breach of contract claim to one sounding in tort." *The Salvation Army v. Blue Cross & Blue Shield of N. Ohio*, 636 N.E.2d 399, 403 (Ohio Ct. App. 1993).

But that blatant pleading deficiency aside, the claim also fails as a matter of law, even assuming Lion actually sought to raise a valid tortious interference claim. At best, Lion's vague references to its customer relationships merely parallel the elements of the cause of action, (*see* Doc. 35 ¶¶ 77–79, #132), which conclusory allegations cannot overcome a motion to dismiss. *Iqbal*, 556 U.S. at 678. The failure to identify with any specificity which business relationships were disrupted or which contracts Lion was forced to breach dooms its tortious interference claim. *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 559 (N.D. Ohio

2021). Again, Lion does not meaningfully attempt to dispute this point other than to point vaguely at the "dozens of paragraphs" in the Amended Complaint that speak in general terms about disruption of Lion's relationship with its customers. (Doc. 44, #207–08). But as noted, that does not cut it under the federal pleading standard.

So Count V of the Amended Complaint will be dismissed as well.

## F.    Count VI – Declaratory Judgment

Lastly, the claim for declaratory relief. Lion seeks a declaration that the MSA's renewal provision is unconscionable and that Worldpay did not substantially perform under the contract. (Doc. 35 ¶ 87, #133). As there is a bona fide dispute over scope of the parties' obligations under the MSA, Lion may validly pursue declaratory relief beyond the standard remedies available for its breach-of-contract claim. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 556–57 (6th Cir. 2008) (holding that a party properly seeks declaratory relief when such relief would determine the legal or contractual validity of one party's actions with respect to the other). Moreover, because the Court holds that Lion's breach-of-contract claim survives Worldpay's motion to dismiss and may proceed to discovery, it follows that Lion can also move forward with this intimately related claim for declaratory relief.[8]

---

[8] Though the breach-of-contract portion of Lion's declaratory judgment claim may move forward, the Court reiterates, as explained above, that Lion does not merit a declaration that the MSA's renewal provision is unconscionable. *See supra* Section II.A & note 4. However, the Court nonetheless declines to dismiss any part of Lion's declaratory judgment claim given there is uncertainty in the law about whether a court may partially dismiss a claim based on its rejection of only some of the theories of liability raised. *Steele v. Cmty. Loan Serv., LLC*, No. 1:23-cv-497, 2024 WL 37116, at *3 (S.D. Ohio Jan. 3, 2024).

Yes, Worldpay is correct that the declaratory judgment claim is duplicative of Lion's breach-of-contract claim. (*Compare* Doc. 35 ¶¶ 39–45, #126–27, *with id.* ¶ 87, #133; Doc. 39, #178, 180). But such duplication does not command a dismissal here. *See Krawczyszyn v. Columbian Life Ins. Co.*, No. 1:21-cv-85, 2021 WL 2722514, at *2 (N.D. Ohio June 30, 2021) (noting that the decision whether to dismiss a duplicative declaratory judgment claim is left up to the discretion of the district court). In this Court's view, "[b]ecause the declaratory judgment and [breach-of-contract] claims are based on the same set of facts, it makes little sense to consider the [breach-of-contract] claim but decline to hear the declaratory judgment claim." *Q Holding Co. v. Repco, Inc.*, No. 5:17-cv-445, 2017 WL 2226730, at *3 (N.D. Ohio May 22, 2017). So the Court concludes that Lion may also proceed to discovery on its declaratory judgment claim.[9]

\*     \*     \*

Altogether, that means only Lion's breach-of-contract claim and related declaratory judgment claim can proceed to discovery as things stand. As to the other claims, the question remains should they be dismissed with or without prejudice? Start with the unjust enrichment, negligence, and ADTPA claims (Counts II–IV of the Amended Complaint) that are subject to dismissal. Lion raised exactly the same claims in these counts of the Amended Complaint in its initial Complaint based on materially similar allegations. (*Compare* Doc. 2 ¶¶ 25–47, #8–11, *with* Doc. 35 ¶¶ 46–

---

[9] Accordingly, the Court leaves for another day the question whether damages for the breach-of-contract claim sufficiently compensates Lion such that declaratory relief is unnecessary (assuming Lion ultimately prevails on that claim). *See Revel Sys.*, 2024 WL 1406107, at *4 & n.5 ("Were this case to progress to a point where it becomes necessary to evaluate *which* remedies are proper, Frisch's may dispute whether Revel's request for specific performance is legally sound. But until that time, this form of requested relief remains untouched.").

75, #127–31). And Worldpay's arguments for dismissing those claims in both the initial and Amended Complaint are also materially similar. (*Compare* Doc. 34, #111– 16, *with* Doc. 39, #168–74). As a result, Lion has twice failed to state a claim for relief for unjust enrichment, negligence, and an alleged violation of ADTPA, so dismissal of these three claims with prejudice is proper. *Andreae v. Cap. One*, No. 1:22-cv-618, 2024 WL 1579914, at *6–*7 (S.D. Ohio Apr. 11, 2024). By contrast, as the tortious interference claim (Count V of the Amended Complaint) is new to the party, the Court will dismiss that claim without prejudice. *See Burkeen v. A.R.E. Accessories, LLC*, 758 F. App'x 412, 416 (6th Cir. 2018).

## CONCLUSION

As explained in detail above, apart from Lion's ADTPA claim, Ohio law applies to all the claims in Lion's Amended Complaint in accordance with the parties' choice of law in the MSA. And when that law is applied, the Court finds that all but Lion's breach-of-contract-related claims (i.e., Counts I and VI of the Amended Complaint) fail to state a claim for relief. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Worldpay's Motion to Dismiss First Amended Complaint (Doc. 38) under Rule 12(b)(6). Specifically, the Court **DISMISSES** Counts II, III, and IV of the Amended Complaint (Doc. 35) **WITH PREJUDICE** and **DISMISSES** Count V of the Amended Complaint (Doc. 35) **WITHOUT PREJUDICE**.

**SO ORDERED.**

April 19, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

28